Filed 3/2/16  In re Lance F. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re LANCE F., a Person Coming Under the Juvenile Court Law. | B261742 |
| | (Los Angeles County Super. Ct. No. DK08668) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent.<br><br>    v.<br><br>C.F.,<br><br>    Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Philip L. Soto, Judge.  Reversed in part and affirmed in part.

Nancy Rabin Brucker, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jessica Paulson-Duffy, Deputy County Counsel for Plaintiff and Respondent.

C.W. (mother) appeals from a judgment of the juvenile court assuming jurisdiction over her son Lance F. (born June 1998). Mother challenges the juvenile court's decision that jurisdiction was warranted under Welfare & Institutions Code section 300.[1] Mother also challenges the dispositional orders removing Lance from her custody, requiring monitored visitation and ordering her to complete a parenting program and individual counseling.

We conclude that the sustained allegations against mother are insufficient to establish jurisdiction, therefore we reverse the judgment in part and reverse the order removing Lance from mother's custody. In all other respects, the judgment is affirmed.

COMBINED FACTUAL AND PROCEDURAL HISTORY

**Initial referral and investigation**

On November 12, 2014, the Department of Children and Family Services (DCFS) received a referral alleging that mother and Lance were homeless and living in a car. It was also reported that mother interfered with Lance's access to counseling services. However, the following week mother requested that the child receive counseling services, as she suspected that he was engaging in a sexual relationship with his minor girlfriend, Trinity S. It was reported that Lance would leave mother's car in the middle of the night. Mother would call Trinity's mother, and find that Lance was at Trinity's home. Mother had driven to the girl's residence and found Lance sleeping on the concrete apartment building staircase. Mother and Lance were overheard while engaged in a verbal confrontation over Lance's relationship with Trinity.

During an interview, Lance denied having a sexual relationship with his girlfriend. He confirmed that he and mother were homeless and sleeping in a car. Mother had food stamps and they showered at the YMCA. Lance stated that as a result of their living situation he is under stress and his grades are poor. Lance would prefer foster care to living with his mother.

---

[1]    All further statutory references are to the Welfare and Institutions Code.

On November 19, 2014, staff at Lance's school became concerned after Lance reported he was not safe with mother and did not want to live with her anymore. Mother had come to the school and broken in to Lance's locker. In addition, mother made a police report on campus that she had been attacked by Lance's girlfriend. Earlier in the day, mother had removed the child from school in order to be tested for sexually transmitted diseases (STD). Around third period, mother brought the child back to school but informed staff that this would be his last day. Mother also took the child's cell phone.

On the same date a DCFS social worker interviewed school counselor Ruth Montiel. Ms. Montiel said she was first introduced to Lance in August 2014, following the death of a student with whom Lance was acquainted. Ms. Montiel took Lance out of class to meet with him. Mother was extremely upset when she learned that Ms. Montiel had provided a therapeutic session for the child. Mother stated that Lance was upset to be taken out of class and now everyone knew he was homeless. Mother asked Ms. Montiel not to meet with Lance without her permission or outside of her presence. However, in a later incident, mother came to Ms. Montiel and asked her to meet with Lance because mother does not like Lance's girlfriend and wants them to stop dating. Ms. Montiel reported that when she talked to Lance, he said he has not had sex but that he no longer wants to live with mother.

The social worker spoke with the school's academic counselor, who described Lance as a good, quiet kid who interacts well with his peers. However, she noted that Lance's grades were poor.

The social worker also met with assistant principal Tracie Bowdowin. Ms. Bowdowin said that mother had reported that Lance said he would kill his parents if they prevented him from seeing Trinity. Mother often calls the school to talk to different staff members and repeats herself over and over. Mother is upset that Lance is leaving early to pick up Trinity before school and is concerned that he is having sex. Mother and Lance have both informed people at the school that they are homeless, living with friends, and showering at the YMCA. Ms. Bowdowin explained that "[p]art of [mother] is a

3

concerned parent . . . concerned about who he's with and what he's doing" but recently she "seemed crazy" because she was "repeating the same thing over and over" in a frantic manner. Ms. Bowdowin also reported that mother was concerned because Lance was failing his classes. Mother had threatened to put him in "military school."

The social worker contacted Ms. S., Trinity's mother. Ms. S. was of the opinion that mother was crazy, either bipolar or using drugs. Ms. S. was not happy about the children dating but found mother's approach inappropriate. Ms. S. reported that Trinity is a virgin. Ms. S. became aware that Lance and Trinity engaged in mutual masturbation on homecoming night and Ms. S. addressed this with Trinity. Ms. S. stated that she does not allow Lance to spend the night at her home and he is told to leave by 8:00 p.m. Ms. S. reported that Lance slept in the hallway of her building on two occasions after an argument with mother. Lance and mother usually sleep in the FedEx parking lot near the child's school. Mother gets very upset when she can't find Lance, and calls everyone she can think of. She has called Trinity's employer and spoken negatively about Trinity. She also calls Trinity's father constantly.

The social worker met with Lance in a private room at the school library. Lance was appropriately dressed and groomed with no visible marks or bruises. Lance explained that he was late for school because his mother took him for a STD test. Lance reported that he is permitted to go to his girlfriend Trinity's home if his mother agrees. He denied being sexually active at Trinity's home but stated that the two of them had been sexually active at a friend's home. Lance related an isolated incident, when he got into a fight with mother and not knowing where else to go, he went to Trinity's apartment building and slept in the hallway. Lance reported that his mother does not like Trinity, believing Trinity is a bad influence on Lance. Mother believes that it is Trinity's fault that Lance is late to school because Lance has been meeting Trinity at the bus stop and going to school with her. Since Lance started dating Trinity, mother has been threatening to transfer him to another school.

Lance stated that he and mother are living in mother's Range Rover. They have food to eat because mother receives food stamps and father pays child support. Lance

4

gets around by bus. Mother and Lance's father (father) were divorced when Lance was six years old, but they were separated prior to that time.[2] When Lance was nine or ten years old and they were living in Florida, Lance was in foster care for six months because the motel room where they were living was moldy and had fleas.

Lance also reported an incident that occurred the previous day involving mother, Lance, and Trinity. Lance had gone to the bus stop to meet Trinity and then go to school with her. Mother was watching them and approached Trinity, getting into a verbal confrontation with her. Lance pushed mother away and he and Trinity went to the bus. Mother called the police because she had been pushed by Lance. Mother arrived at Lance's school with the police and broke into his locker. Law enforcement interviewed Lance and Trinity on campus and no arrests were made.

Lance had no knowledge of mother's mental health history. Lance reported that he and mother are always arguing and screaming at each other. Lance reported that there is not much mother can do to discipline him. She takes away his cell phone and tells him he cannot leave the car. Lance reported instances where he feels unsafe with mother but he was unable to elaborate.

At the time of Lance's last visit with father, they discussed the issues Lance is having with mother. Father did not want to get involved with mother and Lance's relationship. Lance does not want to live with mother, but father stated that he cannot allow Lance to live with him because he has a new wife. Lance denied any drug or alcohol abuse by either mother or father.

The social worker called mother to meet with her at the school. Mother acknowledged that she and the child are living in the car but said that when she has the money she pays a friend in order to sleep on his couch. Mother reported that she and the child shower at the YMCA because she has a membership there. They wash their laundry at the Laundromat and they have food to eat because they get food stamps and child support.

---

**2**     Lance's father, Lance F., is not a party to this appeal.

Mother reported that her issues with Lance stem from Lance's relationship with Trinity. Mother said that people have suggested that mother does not like Trinity because she is African-American, which mother denied. She is upset because Lance will not tell her more about the relationship and she likes to be a hands-on parent. Mother does not like that Lance wakes up at 5:00 a.m. to meet Trinity at the bus. She does not like his secretive behavior and the sense that he is doing things behind her back. Mother expects Lance to tell her everything. In addition, mother is upset because she believes Lance is sexually active with Trinity. She also does not like Lance going to Trinity's apartment because it is in a bad neighborhood. Mother confirmed the recent incident when mother and Lance got in an argument. She stated that Lance left the car, and Trinity's mother telephoned mother to let her know that Lance was in the stairwell of the apartment building.

Mother denied that Lance said he would kill her if she does not allow him to have a relationship with Trinity. However, she stated that Lance said he would kill her and father if they made him change schools.

Mother also confirmed the family's prior DCFS experience in Florida. Mother stated that she and Lance were sick for several weeks so she stopped sending Lance to school. They were living in a condominium and mother was unaware that there was mold in the condominium causing their illness.

**Safety plan**

On November 19, 2014, to give Lance and mother a chance to calm down, the social worker created a safety plan. Mother agreed that Lance could stay at father's home for a period of time.

On November 21, 2014, the social worker completed a scheduled home visit to father's home. Father reported that although the child was staying at his home, mother insisted on picking him up and driving him to school every day. The previous night, mother, father and Lance agreed that Lance could go to Trinity's home for dinner. Although mother was aware of the plans, she arrived at Trinity's home with law enforcement. She claimed that the child was not supposed to be there. Father arrived at

6

the scene and took Lance with him, since Lance refused to go with mother. Lance expressed a fear of being with mother because he was afraid she would take him to another state while he was sleeping, which is what mother did during their previous child services case in Florida.

Mother confirmed the incident of the previous night, but denied that she was informed that Lance would be at Trinity's home. She had telephoned Lance's employer and was notified that he was not at work. She made several attempts to contact the child and father and then decided to drive to Trinity's house with the police because she thought Lance would be there. Mother stated that Lance did not have her permission to be at Trinity's home.

On the same date, the social worker contacted the child's school and was informed that a stay away order had been issued against mother. Mother violated the privilege of the visitor pass because she used the pass to gain access to the school to see a counselor, but was later found hiding on campus, presumably to find Lance and his girlfriend together.

On December 3, 2014, an application to remove Lance from the custody of mother was executed and filed. On December 9, 2014, Lance was removed from mother and placed with father.

**Section 300 petition**

On December 12, 2014, DCFS filed a petition pursuant to section 300 on behalf of Lance. The petition contained a single allegation pursuant to section 300, subdivision (b):

> "The child Lance [F.]'s mother, [C.W.], is unable to provide the child with ongoing care and supervision in that the child is unwilling to reside in the mother's care and supervision. Said inability of the mother to provide care and supervision of the child endangers the child's physical health and safety and places the child at risk of harm and damage."

DCFS recommended that Lance be detained in the home of father.

7

At the detention hearing on December 12, 2014, mother and father were present and were appointed counsel. Father was found to be the presumed father of Lance. The juvenile court found that a prima facie showing had been made that Lance was described by section 300 and that detention from mother was necessary. Lance remained released to father. The court ordered that mother could have monitored visits three times per week, three hours per visit. Mother was also permitted to have unmonitored visits in father's home as long as father was present. The court ordered that a section 301 contract was to be addressed in the next report.

**First amended petition**

The events leading up to the filing of the amended petition were as follows: on December 30, 2014, DCFS received a child protection hotline referral alleging that father had ordered Lance out of his home and allowed the child to stay with mother. DCFS contacted father, who confirmed he had removed Lance on December 24, 2014, after Lance stole a ring from a family friend. Father denied that Lance was arrested and confirmed that the ring was returned. Father also said that Lance sent a text message to another minor threatening to shoot him with father's gun because Lance felt that the other minor was going to disrupt his relationship with Trinity. Father refused to permit Lance back in his home.

Mother stated during her interview, that Lance chose to live with her. She stated that she had obtained housing in a "hut." Mother agreed to bring Lance to the DCFS office. DCFS later received a telephone call from law enforcement stating that Lance refused to leave Trinity's home with mother. Mother reported that Lance ran away, but Lance reported that mother had kicked him out. Law enforcement transported Lance to the DCFS office.

Lance stated that on December 24, 2014, father had kicked him out and told mother to take him. Father was upset because Lance had taken a ring and had threatened to kill another minor, although Lance denied that he actually planned to harm the minor. Lance reported that mother took him to reside in a "hut" at another person's home. Lance reported that the homeowner used marijuana. Lance argued with mother on

8

December 28, 2014, regarding their living situation. Despite mother's instruction that he not leave, he left and went to Trinity's home. Lance reported that living with father was not an option, as father had grabbed his throat and thrown him down.

Ms. S. was interviewed on December 30, 2014. She reported that Lance gave Trinity a ring on December 25, 2014. Though Lance said he had purchased it, the next day, father asked Trinity if Lance had given her a ring and requested a description. Ms. S. then believed that Lance had stolen the ring. Ms. S. was aware that father had ordered Lance out of his home after Lance threatened someone via text message.

On January 5, 2015, a first amended petition was filed. The amended petition contained a new count under section 300, subdivision (b), alleging that father was unable to provide Lance with ongoing care and supervision, and that Lance was unwilling to reside with father, resulting in him being at risk of harm.

Also on January 5, 2015, an ex parte application and order pursuant to section 385 was filed, requesting that Lance be removed from the home of his father and placed in foster care, as father was not willing to provide care for Lance, who was unwilling to return to either parent's home. The juvenile court found that a prima facie showing had been made, Lance was detained, and temporary placement and custody was vested with DCFS. The court ordered that both parents have monitored visits with Lance, three times per week, three hours per visit.

The juvenile court further ordered that DCFS was to have a team decision making meeting with the parents on January 13, 2015, to assess whether arrangements could be made for Lance to be returned to either parent. DCFS was granted discretion to release Lance to either or both parents. Conjoint counseling was ordered for Lance and each parent to commence, separately, at the end of that week.

**Jurisdiction and disposition**

The adjudication hearing took place on January 27, 2015. Mother and father were present with counsel. Mother's attorney argued that the court should dismiss count b-1, as the allegations were insufficient to show that the child was at risk of serious harm. Mother's counsel pointed out that the child's unwillingness to reside with the mother was

9

not a sufficient basis for jurisdiction, and "there is a lack of articulated risk in the actual pleading." Mother's counsel reminded the court that homelessness in itself is not enough for the court to sustain an allegation against mother and that mother had a constitutional right to parent her child. Counsel added that mother had valid reasons for her concerns regarding her son and his recent behavior, and that mother now had a stable residence.

The court denied mother's counsel's request that the allegations against mother be dismissed. The court explained:

> "But we have the ability to take up these issues in dependency court when we have facts as we do here with regards to the inability or unwillingness to properly parent a child which is really what we have here in these counts. You may not feel that way. But looking at it objectively -- and, again, like I say, I understand where you're coming from. I feel for you, because it's not -- you're not the first mom that's had difficulty with an out-of-control teenager. I've had these cases before. I, unfortunately, will probably have them again. But that doesn't mean I can just wash my hands of it and say, 'you guys work it all out and good-bye and good luck.' That's not the best way to handle it. That's not protecting the child."

Mother pointed out for the record that she was concerned about Lance's behavior in the group home where he was residing and she believed that he was being allowed to engage in behavior of which she did not approve.

Lance was declared a dependent of the court, removed from the custody of his parents and placed in the care of DCFS for suitable placement. Family reunification services were provided to the parents. The court ordered conjoint counseling for Lance with each parent. Mother was ordered to participate in a parenting program and to attend individual counseling to address case issues. Lance was ordered to participate in individual counseling. The parents were granted monitored visits with Lance, a minimum of three times per week, three hours per visit. DCFS was granted discretion to liberalize the parents' visits.

On January 27, 2015, mother filed a timely notice of appeal challenging the findings and orders of the court made on January 27, 2015.

10

## DISCUSSION

### I. Standards of review

We review the juvenile court's findings under the substantial evidence standard. (*In re David M.* (2005) 134 Cal.App.4th 822, 829; *In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) Under this standard, we review the record to determine whether there is any reasonable, credible, and solid evidence to support the juvenile court's conclusions. We resolve all conflicts in the evidence, and make all reasonable inferences from the evidence, in support of the court's orders. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393).

The juvenile court's decision to remove a child from a parent's custody is also reviewed for substantial evidence. In the case of removal, we determine whether substantial evidence shows the existence of clear and convincing evidence that the child had to be removed from his parent's custody. (*In re Amos L.* (1981) 124 Cal.App.3d 1031, 1038.)

Dispositional orders are reviewed for abuse of discretion. (*In re A.E.* (2008) 168 Cal.App.4th 1, 4.)

### II. The merits of mother's appeal should be addressed

DCFS argues that where only one parent challenges the jurisdictional allegations, and the second parent has declined to challenge, a valid basis for jurisdiction remains as to the child. (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875 ["The reviewing court may affirm a juvenile court judgment if the evidence supports the decision on any one of several grounds"].) In other words, where one basis for jurisdiction is supported by substantial evidence, the reviewing court need not consider the sufficiency of the evidence to support the other basis. (*In re La Shonda B.* (1979) 95 Cal.App.3d 593, 599-600 ["where a minor had been neglected or abused by either parent, these code sections [section 300 and related code sections] support a judicial finding that the minor is a person described by section 300"].)

DCFS requests that this court decline to follow *In re Drake M.* (2012) 211 Cal.App.4th 754 (*Drake M.*). In *Drake M.*, the father challenged a single jurisdictional

11

finding against him involving his use of medical marijuana. DCFS argued that the unchallenged findings against the mother would continue to support jurisdiction, therefore father's appeal was nonjusticiable. (*Id.* at p. 762). The *Drake M.* court decided to consider the merits of father's appeal, stating:

> "Here, the outcome of this appeal is the difference between father's being an 'offending' parent versus a 'non-offending' parent. Such a distinction may have far-reaching implications with respect to future dependency proceedings in this case and father's parental rights. Thus, although dependency jurisdiction over Drake will remain in place because the findings based on mother's conduct are unchallenged, we will review father's appeal on the merits."

(*Drake M., supra*, 211 Cal.App.4th at p. 763.)

Mother argues that here, as in *Drake M.*, the jurisdictional findings could have an effect on current or future dependency proceedings. The outcome of the appeal could mean the difference between mother being an "offending" versus a "non-offending" parent. In addition, the findings serve as the basis for dispositional orders that are also challenged on appeal, including the removal of Lance from mother's custody and mother's restriction to monitored visitation. (*Drake M., supra,* 211 Cal.App.4th at pp. 762-763 [suggesting the Court of Appeal should reach the merits of a challenge to a jurisdictional finding when the finding serves as the basis for dispositional orders that are also challenged on appeal].)

Here, as in *Drake M.*, the jurisdictional findings serve as a basis for challenged dispositional orders and may be prejudicial in the current or future dependency proceedings. We agree with mother that the outcome of the appeal could mean the difference between mother being an "offending" rather than a "non-offending" parent. (See *Drake M., supra*, 211 Cal.App.4th at pp. 762-763.) We therefore conclude that this is one of the rare cases that fall under the exception set forth in *Drake M.*, and although jurisdiction over Lance will remain in place because father has declined to challenge the findings based on his conduct, we address mother's contentions on the merits.

**III. There is no substantial evidence to support the trial court's jurisdictional finding with respect to mother**

In order for a juvenile court to assert jurisdiction over a minor under section 300, subdivision (b), the court must find that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child." The statute specifies: "The child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from the risk of suffering serious physical harm or illness." (§ 300, subd. (b).) As the Supreme Court has explained, section 300 is designed to "limit court intervention to situations in which children are threatened with serious physical or emotional harm." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 303.)

In this matter, there are no allegations that Lance suffered serious physical harm or illness. Nor are there any allegations of a substantial risk that Lance will suffer serious physical harm or illness. The allegations state simply that mother is unable to provide the child with ongoing care and supervision "in that the child is unwilling to reside in the mother's care and supervision." There is a conclusory allegation that this alleged inability of the mother to provide care "endangers the child's physical health and safety and places the child at risk of harm and damage." However, DCFS provides no concrete examples of risk or danger to the child's health and safety if left in mother's care.

"The basic question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm. [Citation.]" (*In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1134.) In this case, it is impossible to articulate a defined risk of harm. There are no allegations of physical abuse by mother against the child. There is no suggestion that mother is engaging in destructive behavior such as abusing drugs or alcohol, which could negatively influence the child. Nor is there any suggestion that the child is engaging in self-destructive behaviors. As mother pointed out, Lance did not belong to any gangs, nor did he smoke, drink, or use drugs. In fact, he was described by school personnel as a good, quiet kid who interacted well with his peers. While his

13

grades had fallen recently, mother attributed that to Lance behaving as "a typical teenager, who has recently become disrespectful and disobedient after discovering physical intimacy." Contrary to the juvenile court's assessment, we find no evidence in the record that Lance had become "out-of-control."

When pressed for evidence that Lance was at risk of physical harm or illness, DCFS presents a list of undesirable behaviors that Lance had recently exhibited: he was tardy at school; his grades were dropping; and he failed to comply with mother's rules, including failing to notify her of his whereabouts. He was sexually active with another minor, and stole an expensive ring to give to her. He had even threatened to shoot another minor. While these behaviors would surely be troubling to any parent, none of them place Lance at substantial risk of physical harm or illness as contemplated by section 300, subdivision (b).

DCFS makes much of the isolated event when Lance spent the night in the concrete hallway of his girlfriend's apartment building. DCFS argues, "[f]or obvious reasons, DCFS was concerned that Lance was not safe when he left home, sleeping in a concrete stairwell in a reportedly high-crime neighborhood, out at all hours of the night." DCFS argues that mother's inability to keep Lance from leaving her car, or her act of forcing Lance to leave, brought the child within the description of section 300, subdivision (b), which provides for juvenile court jurisdiction where there is a "substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child."

We find that the evidence that Lance slept in his girlfriend's stairwell on one occasion is insufficient to establish a substantial risk of physical harm or illness. Both Lance and mother stated that this was an isolated incident. There is no evidence that Lance was harmed or at risk of any specific harm while sleeping in the hallway of Trinity's apartment. Trinity's mother telephoned mother to make her aware that Lance was there in the hallway. Thus two adults were aware of Lance's whereabouts. There is

14

no suggestion that Lance was ever at risk of physical harm or illness during this isolated incident.

In re Janet T. (2001) 93 Cal.App.4th 377 (*Janet T.*) is instructive. In *Janet T.*, the family was homeless and moved frequently. The petition alleged that the mother failed to ensure that the children attended school regularly and exhibited mental and emotional problems. (*Id.* at pp. 387-388.) While the court acknowledged that failing to attend school regularly was detrimental to the children, it pointed out that such detriment "is not the same as saying the failure to attend school created a 'substantial risk' of suffering '*serious physical harm or illness.*'" (*Id.* at pp. 388-389.) In addition, the allegations of mother's mental and emotional problems were insufficient where the "petition itself provided no other facts to suggest how mother's mental health problems created a 'substantial risk' her children would suffer 'serious physical injury or illness.'" (*Id.* at p. 389.) DCFS asked the *Janet T.* court to consider the prior DCFS history of the family. While the court set forth that history in detail, it concluded that "none of these conditions existed at the time of the hearing on the petition." (*Id.* at p. 390.) In sum, "neither the petition nor the reports alleged necessary facts to support the conclusion the children were currently at a substantial risk of serious physical injury or illness because of mother's mental and emotional problems." (*Ibid.*)

As in *Janet T.*, there is no evidence in the petition or the reports supporting a finding that Lance was at substantial risk of physical harm or illness. With a record devoid of any evidence of harm or risk of harm, we must reverse the juvenile court's finding that Lance was a child described by section 300, subdivision (b).[3]

---

[3]    We acknowledge the debate, set forth in the parties' briefs, regarding the issue of parental fault. Mother relies on *In re Precious D.* (2010) 189 Cal.App.4th 1251, in which it was held that jurisdiction under section 300, subdivision (b) is not supported if a parent is unable to provide care and supervision of an incorrigible child where the parent is blameless. The Supreme Court has taken up the issue by granting review of *In re R.T.* (2015) 235 Cal.App.4th 795, review granted June 17, 2015, S226416 (holding that section 300, subdivision (b)(1) authorizes jurisdiction without a finding of parental fault or neglect). We need not reach the issue of parental fault in this matter, as the juvenile

**IV. Substantial evidence did not support Lance's removal from mother's custody**

Nor is there substantial evidence supporting the juvenile court's order removing Lance from mother's custody. In order to remove a child from a parent's custody, the juvenile court must find by clear and convincing evidence any of the factors set forth in section 361, subdivision (c). Section 361, subdivision (c) provides, in relevant part:

> "A dependent child shall not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances listed in paragraphs (1) to (5) . . .

> "(1) There is or would be substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody."

As explained in *In re Henry V.* (2004) 119 Cal.App.4th 522, 525:

> "The fundamental right to the care and custody of one's child is protected by Constitution and statute. [Citations]. A child may not be taken from a parent's physical custody during juvenile dependency proceedings . . . unless clear and convincing evidence supports a ground for removal specified by the Legislature. Removal on any ground not involving parental rejection, abandonment, or institutionalization requires a finding that there are no reasonable means of protecting the child without depriving the parent of custody. [Citations.]"

In other words, removal is a "last resort, to be considered only when the child would be in danger if allowed to reside with the parent." (*In re Henry V., supra*, 119 Cal.App.4th at p. 525.)

As explained above, the record is devoid of any evidence that Lance was in danger. There was no evidence that he was ever harmed, or was at substantial risk of

---

court's assumption of jurisdiction over the child must be reversed due to a lack of evidence that the child was at substantial risk of harm.

16

harm, with mother. Under the circumstances, the order removing Lance from mother's custody must be reversed.[4]

## V. Mother lacks standing to challenge father's jurisdictional count

Mother challenges the findings and orders of the juvenile court imposed against father. Although father is not challenging those findings and orders himself, mother argues that she has standing to do so. Mother cites *In re L. Y. L.* (2002) 101 Cal.App.4th 942, 948 (*L. Y. L.*), for the proposition that standing exists where a party has "a legally cognizable interest that is injuriously affected by the court's decision. [Citation.]"

We find the case to be inapplicable. In *L. Y. L.*, a mother argued that the juvenile court erred in terminating her parental rights because the exception set forth in section 366.26, subdivision (c)(1)(E) applied. Section 366.26, subdivision (c)(1)(E) sets forth the sibling relationship exception to termination of parental rights. The agency argued that mother had no standing to assert the section 366.26, subdivision (c)(1)(E) exception because it does not address the parent-child relationship. The *L. Y. L.* court disagreed, finding that the parent has standing to assert the section 366.26, subdivision (c)(1)(E) exception to termination of parental rights because the parent is directly aggrieved by a decision on the issue. (*L. Y. L., supra*, 101 Cal.App.4th at p. 948.)

Mother cites no law indicating that a parent has standing to contest jurisdictional findings made against the other parent. Nor does she make any argument that she is aggrieved by the findings involving father. In fact, mother admits that father was never a

---

**4** The juvenile court also imposed dispositional orders requiring mother to participate in and complete a parenting program and to attend individual counseling. Mother argues that there is no nexus between these dispositional orders and the facts of the case. (*In re Sergio C.* (1999) 70 Cal.App.4th 957.) While the record shows no substantial risk to Lance, there is evidence in the record that Lance and mother were at odds over certain issues and were not getting along. In addition, there was evidence that mother's actions in dealing with her son were inappropriate, at least in the minds of school officials and others. Because the juvenile court will maintain jurisdiction over Lance, it has "broad discretion to make virtually any order deemed necessary for the well-being of the child. [Citation.]" (*Id*. at p. 960.) It was within the juvenile court's discretion to conclude that these programs could help to ease the tension in the mother-son relationship and thus benefit Lance.

willing participant in Lance's life.  She states that father did not want Lance to live with him, and Lance did not want to live with his father.  Thus, she cannot claim to be injured by the juvenile court's decision to sustain allegations confirming these facts.

## DISPOSITION

The judgment is reversed in part as to the jurisdictional finding that pertains to mother.  The order removing Lance from mother's custody is also reversed.  In all other respects, the judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
HOFFSTADT